**THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | No. 24-CR-00037-01--SRB |
| JOHNSON A. MANGOL, | ) | |
| | ) | |
| Defendant. | ) | |

―――――――――――――――――――――――――――――――――――――――――――

**MOTION TO DISMISS COUNT EIGHT OF THE INDICTMENT**
―――――――――――――――――――――――――――――――――――――――――――

Johnson A. Mangol moves to dismiss count eight of the indictment charging him with unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) and 924(a)(8). (Doc 56). Under the text-and-history analysis set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 24 (2022), § 922(g)(1) is unconstitutional on its face and as applied to Mr. Mangol. The indictment fails to state an offense and must be dismissed. Fed. R. Crim. P. 12(b)(3)(B)(v).

The Supreme Court has not yet ruled on the constitutionality of § 922(g)(1). *United States v. Rahimi*. 602 U.S. 680, 144 S.Ct. 1889, 1903 (2024) (limiting its holding to the constitutionality of § 922(g)(8)); *id.* at 1909-10 (Gorsuch, J., concurring) (emphasizing that the Court was not deciding whether a ban on firearm possession on a categorical basis to any group of persons is permissible or whether the government may disarm an individual permanently). *Rahimi* vacated the Eighth Circuit's judgment in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), but post-*Rahimi* an Eighth Circuit panel has again upheld the constitutionality of § 922(g)(1). *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024).

Case 4:24-cr-00037-SRB    Document 67    Filed 03/11/25    Page 1 of 27

On remand, *Jackson* again applied *Bruen* incorrectly, misinterpreted and misrepresented the historical record, and was wrongly decided. When the historical record is viewed in full and interpreted correctly, it is easy to see that § 922(g)(1) is unconstitutional on its face, because there are no historical statutes permanently banning felons from possessing firearms. *Jackson* relies on historical analogues that do not share comparable justifications or burdens with § 922(g)(1). And the statute is clearly overbroad, because it permanently bans firearm possession by all felons, dangerous or not, in all places, for any reason.

The statute is unconstitutional as applied to Mangol, because Mangol's past convictions did not involve violence. Mangol possessed the firearm for self-defense as he lived in a dangerous neighborhood with significant criminal activity. Mangol merely possessed the firearm in his home and did not use, or threaten to use, the firearm.

**I. *Bruen* requires analysis of the plain text of the Second Amendment and an exhaustive examination of "this Nation's historical tradition of firearm regulation."**

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Mr. Mangol's alleged possession of a firearm is protected conduct; therefore, the government must demonstrate that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation." *Id*. The government cannot meet its burden of proof.

**A. Mr. Mangol is part of "the people," and his conduct is presumptively protected under the plain text of the Second Amendment.**

Mr. Mangol meets the first prong of the *Bruen* framework for several reasons. First, he is part of "the people" for whom the Second Amendment guarantees the right to keep and bear arms, and the gun he purportedly possessed is among those weapons deemed bearable arms.

Second, *dictum* from *District of Columbia v. Heller*, *McDonald v. City of Chicago, Ill.,* and concurring opinions in *Bruen* about longstanding prohibitions on felons possessing firearms are not holdings. *District of Columbia v. Heller*, 554 U.S. 570, 626, 635 (2008); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 81 (Kavanaugh, J. and Roberts, C.J., concurring). Whether felons can be stripped of their Second Amendment rights depends on history, not stray remarks from a handful of opinions in which the Supreme Court did not address, let alone decide, the issue. *Jackson* is wrong to rely on this *dictum*. 110 F. 4th at 1123-4.

### 1. Mr. Mangol is part of "the people."

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., Amend. II. The Bill of Rights refers to "the people" in the Preamble, First, Second, Fourth, Ninth, and Tenth Amendments, and the phrase has a *uniform* meaning throughout the Bill of Rights. *Heller*, 554 U.S. at 579-80. *Heller* cited with approval *United States v. Verdugo-Urquidez,* in which the Supreme Court defined "the people" in the Fourth Amendment context as "a term of art" that "refers to a class of persons, who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. at 580, quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

The term "the people" unambiguously refers to all members of the community, "not an unspecified subset." *Id.* at 580. The right to keep and bear arms "belongs to all Americans." *Id.* at 581; *Bruen*, 597 U.S. at 70; *Worth v. Jacobson*, 108 F.4th 677, 689 (8th Cir. 2024). The plain text of the Second Amendment does not make a felon/non-felon distinction, and felons are "indisputably part of 'the people.'" *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also*, *United States v. Williams*, 718 F. Supp. 3d 651, 664-65 (E.D. Mich. 2024).

"The Second Amendment does not have a freestanding, extratextual dangerousness catchall" that includes felons. *Worth*, 108 F.4th at 689.

*Heller* also held that "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. Handguns, such as a Ruger, Model SR9, 9 mm caliber handgun, and a Springfield Armory, Model EP9, 9 mm caliber handgun, (Doc 4, ¶ 2-3) purportedly possessed by Mr. Mangol, and ammunition for those handguns are "bearable arms" protected by the Second Amendment. *Id*. at 584 (bearable arms include firearms worn or carried on the person "for the purpose … of being armed and ready for offensive or defensive action in case of a conflict with another person"), quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998).

The term "the people" also includes permanent legal residents. In *United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023), the Court rejected the notion that the Second Amendment extended to *unlawfully* present aliens. 64 F.4th at 987. In reaching this conclusion, the Court found that a person not lawfully present in the country does not fall within the term "the people." However, permanent legal residents are, "a class of persons, who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." See e.g. *Heller* at 580, quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

Mr. Mangol developed deep connections with this country during decades of living and growing a family in this country, working in the community, and developing ties to family and friends in the community. Additionally, his status as a permanent legal resident illustrates and solidifies his development of sufficient connection with this country. Mr. Mangol is a permanent legal resident and undoubtedly a member of "the people" with the right to keep and bear arms

such as the handgun and ammunition he purportedly possessed.  His purported conduct is presumptively protected by the plain text of the Second Amendment.  *Bruen*, 597 U.S. at 24.

**2. *Dicta* from *Heller*, *McDonald*, and *Bruen* does not exclude Mr. Mangol from "the people," thus his conduct is protected under the Second Amendment.**

The *Heller* Court said nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."  554 U.S. at 626.  This remark was echoed in *McDonald* and in concurring opinions in *Bruen*.  *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 81 (Kavanaugh, J. and Roberts, C.J., concurring).  This *dictum* does not oust Mr. Mangol from Second Amendment protection for at least two reasons.  First, *Heller* itself undermined its own *dictum*.  Second, Article III of the Constitution does not permit the use of *dicta* in this fashion.

*Heller* qualified its *dictum*, admitting the Court had not "undertake[n] an exhaustive historical analysis … of the full scope of the Second Amendment."  554 U.S. at 626.  *Heller* referred to these unidentified "longstanding prohibitions" as "presumptively lawful regulatory measures," but did not explain why they were presumed lawful.  *Id*. at 626-27, n. 26.  Regardless of what the Court may have had in mind, the phrase "presumptively lawful" brings with it the possibility of a successful challenge to the statute's lawfulness.  The Court was unmistakably clear, however, when it mocked the notion that the scope of a fundamental right could be decided on *dictum*: "It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted *dictum* in a case where the point was not at issue and was not argued." *Id*. at 625, n. 25.  *Dicta* do not bind future courts and are not the law. Garner, Bryan A., *The Law of Judicial Precedent* (2016) at 44.

Justice Gorsuch forcefully made this point in *United States v. Rahimi*, 602 U.S. 680, 144 S.Ct. 1889 (2024), the Court's first application of *Bruen*. Justice Gorsuch said the Court did not "resolve whether the government may disarm an individual permanently," nor did it "purport to approve in advance other laws denying firearms on a categorical basis to any group of persons a legislature happens to deem, as the government puts it, 'not responsible.'" *Id*. at 1909-10 (Gorsuch, J., concurring). Justice Gorsuch explained that the Court could not decide those questions because Article III of the Constitution gives the Court only the power to decide actual cases before the Court, not future cases or abstractions. *Id*. at 1910.

What is said in an opinion may not be stretched beyond the context of the issue presented. *Id*., citing *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (rejecting habeas petitioner's attempt to extract "a handful of sentences" "from decisions that had no reason to pass on the argument" he was making to the Court). Justice Gorsuch's message is clear. The Court has not determined whether a categorical and permanent prohibition on felons is constitutional and could not have decided that issue in *Heller*, *McDonald*, or *Bruen* because the question was not before the Court in those cases.

After deciding *Rahimi*, the Court again stressed the limits of its power under Article III in *Loper Bright Enterprises*, *et al. v. Raimondo*, saying a court can only adjudicate "Cases" and "Controversies," which are "concrete disputes with consequences for the parties involved." 144 S.Ct. at 2257; Art. III, § 2, cl. 1. In a concurring opinion, Justice Gorsuch elaborated, saying "when judges reach a decision in our adversarial system, they render a judgment based *only* on the factual record and legal arguments the parties at hand have chosen to develop." *Id*. at 2281 (Gorsuch, J., concurring) (emphasis added). Stray asides, general expressions, and *dicta* in judicial opinions cannot control the judgment in later cases. *Id. Dicta* and stray remarks must be

read "in light of the subject under consideration." *Id.*, quoting *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010 (*en banc*) (declining to rely on *Heller*'s references to "longstanding prohibitions on the possession of firearms by felons" and "law-abiding, responsible citizens" as if they were holdings governing the constitutionality of § 922(g)(9)).

Despite their *dicta* about longstanding prohibitions on firearm possession, *Heller*, *McDonald*, and *Bruen* decided nothing about the constitutionality of § 922(g)(1). Because Mr. Mangol is part of "the people" and his conduct is protected by the Second Amendment, the burden shifts to the government to "affirmatively prove" that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 19, 24.

**B.  Historical analysis under *Bruen* requires a well-established tradition of regulation from the Founding era that is distinctly similar to the challenged statute.**

The government's burden is heavy and rightly so given § 922(g)(1)'s expansive scope; all felons, dangerous or not, are forever prohibited, without exception, from possessing a firearm at home or in public.  To satisfy its burden under *Bruen*, the government must affirmatively prove that: 1) a well-established historical tradition embodied in enacted regulations, 2) existed in the Founding era, and 3) shared the appropriate degree of similarity to § 922(g)(1).

**1.  The government must demonstrate a well-established tradition embodied in enacted regulations.**

While *Bruen* did not elaborate on the specific quantum of proof needed to establish a tradition of gun regulation, the opinion referred to: "well-established" and "longstanding" regulations, *id*. at 30; "a long, unbroken line of common law," "a regular course of practice" *id*. at 35; a governmental practice that has been "open, widespread, and unchallenged since the early days of the Republic" *id*. at 36; a "history [that] reveals a consensus" *id*. at 53; and "a consensus

view" *id*. at 55. The Court also scoffed at the notion that "*three* colonial regulations could suffice to show a tradition of public-carry regulation." *Id*. at 46 (emphasis in the original); *also see*, *id*. at 49 ("eight years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment"); *id*. at 58 ("a handful of other examples in Massachusetts and the District of Columbia" were "too slender a reed on which to hang a historical tradition of restricting the right to public carry").

## 2. The government must point to historical regulations in existence in the founding era.

*Bruen* explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 34 (emphasis in original). The relevant "historical tradition" is that which existed in 1791, when the Second Amendment was ratified. *Id.* Courts may look to the tradition of firearms regulation "before, during, and even after the founding" period, but they should do so with care. *Id.* at 27. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 34.

Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*at 35 (cleaned up). English common law is not to be assumed as that of America. *Id*. at 39. This is important, as will be discussed later, because the Second Amendment was drafted as a rebuke to abusive practices in England in which kings denied disfavored groups their inherent right to bear arms for self-defense. *Rahimi*, 144 S.Ct. 1889, 1914-15 (2024) (Kavanaugh, J., concurring); *id.* at 1933-35 (Thomas, J., dissenting).

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35. Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *Id.* at 36 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.").

**3. The historical regulations must share the appropriate degree of similarity to the challenged law.**

Under step two of *Bruen*, the analysis employed to determine whether a historical tradition of firearm regulation exists depends on the modern-day statute being analyzed. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is inconsistent with the Second Amendment." *Id.* at 26 (emphasis added). "Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26-27. Section 922(g)(1) is aimed at preventing gun violence, a problem which existed at the founding; thus, the government must be able to establish the existence of distinctly similar statutes from that era. The government cannot meet its burden of proof because there simply are no historical statutes from the founding era banning felons from possessing firearms.

For modern statutes addressing "unprecedented societal concerns," "dramatic technological changes," and "circumstances beyond those the Founders specifically anticipated,"

9

analogical reasoning may be used. *Id.* at 27-28. When using analogical reasoning, a court may compare a "relevantly similar" historical analogue to the modern-day statute being challenged. *Id.* at 28-29. Whether a law is a relevantly similar historical analogue depends largely on two questions, "how" and "why" the regulation burdens the right to bear arms. *Id.* at 29. Analogical reasoning requires an assessment of whether modern and historical laws impose "a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*

## II. *Rahimi* rejected much of what the Eighth Circuit said in its now-vacated opinion, *United States v. Jackson*.

*Rahimi* clarified *Bruen*'s methodology saying, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 144 S.Ct. at 1898. An exact historical match is not required, and *Rahimi* appears to allow some level of abstraction when addressing the "why" question. *Id.*, quoting *Bruen*, 597 U.S. at 29 (a court must apply "faithfully the balance struck by the founding generation to modern circumstances"). But a court should not "read a principle at such a high level of generality that it waters down the right." *Id.* at 1926 (Barrett, J., concurring). The extent of the regulation (the "how") is governed by the practice at the founding. *Id.* at 1898. "Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.*

*Rahimi* upheld the facial validity of 18 U.S.C. § 922(g)(8)(C)(i), which bars an individual from possessing a firearm if he is under a restraining order that includes a finding that he poses a credible threat to the physical safety of a protected person. *Rahimi*, 144 S.Ct. at 1898. *Rahimi* found that surety laws and "going armed" laws provided historical support for temporarily disarming individuals subject to a restraining order under the statute. *Id.* at 1899-1901.

The "going armed" laws prohibited individuals from carrying weapons "to the Terror of the People." *Id*. at 1901. The typical case "involved fighting in public," and conduct that "disrupted the public order" and "led almost necessarily to actual violence." *Id*. (cleaned up). The offense could be punished with forfeiture of arms and imprisonment. *Id*.

Under surety laws, a person found to pose a threat to others could be required to post a bond, for no longer than six months, and if he did not keep the peace, the bond would be forfeited. *Id*. at 1900. If he could not post a bond, he would be jailed. *Id*. But surety laws had exceptions based on individual circumstances. *Id*. "[A]n individual could obtain an exception if he needed his arms for self-defense or some other legitimate reason." *Id*.

*Rahimi* repudiated key aspects of the analysis in *Jackson*. First, *Rahimi* carefully emphasized that surety bonds were of limited duration, and therefore supported only *temporary* disarmament. *Rahimi* did not so much as hint that "going armed" laws permitted lifetime disarmament for mere possession of a firearm, as does § 922(g)(1). *Rahimi*'s emphasis on the limited duration of surety bonds stands in stark contrast to the Eighth Circuit's *Jackson* opinion, which fails to identify historical analogues establishing a tradition of *lifetime* disarmament. 110 F. 4th at 1126-28. While surety laws are relevantly similar to the burdens imposed by § 922(g)(8), the same cannot be said about § 922(g)(1). Surety bonds were individualized in their determinations of risk and prospective in operation, applying only while the risk existed. *Id*. at 1900 (before a surety bond was imposed, a judge or justice of the peace determined whether reasonable fear of harm existed).

Second, the surety laws examined in *Rahimi* provided exceptions based on individual circumstances. *Id*. "[A]n individual could obtain an exception if he needed his arms for self-defense or some other legitimate reason." *Id*. *Jackson* prevents as-applied constitutional

challenges, saying Congress can categorically prohibit all felons from possessing firearms, with "no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." 110 F. 4ᵗʰ at 1128. That a person subject to a surety law could "obtain an exception if he needed his arms for self-defense or some legitimate reason" makes *Jackson*'s attempt to prevent as-applied challenges a non-starter. The very existence of exceptions demonstrates that the right to bear arms was determined based on an individual's circumstances, not what category or group he might fall in.

Third, *Rahimi* rejected *Jackson*'s reliance on historical practices in England that disarmed "political opponents and disfavored religious groups." *Cf. Jackson*, 110 F.4ᵗʰ at 1126, and *Rahimi*, 144 S.Ct. at 1899; *id*. at 1914-15 (Kavanaugh, J., concurring) (The Framers drafted the Bill of Rights to reject, not approve, the "British laws and the system of oppressive British Rule"); *id*. at 1934 (Thomas, J., dissenting) (The English Bill of Rights was the predecessor to the Second Amendment, not the Stuart Kings' practice of suppressing political dissidents and Protestants by disarming them).

Finally, *Rahimi* did not endorse the government's argument that only "responsible" people can possess firearms. In its brief, the government argued vigorously that only law-abiding, responsible people can bear arms. *Rahimi*, 2023 WL 5322645 at *6, 10-22 (Brief for the United States). The Court specifically referred to the government's brief and rejected the argument:

> [W]e reject the Government's contention that Rahimi may be
> disarmed simply because he is not 'responsible.' "Responsible' is
> a vague term. It is unclear what such a rule would entail. Nor
> does such a line derive from our case law. In *Heller* and *Bruen*, we
> used the term 'responsible' to describe the class of ordinary
> citizens who undoubtedly enjoy the Second Amendment right. But
> those decisions did not define the term and said nothing about the

> status of citizens who were not 'responsible.' The question simply
> was not presented.

*Rahimi*, 144 S.Ct. at 1903 (internal citations omitted).

In his dissent, Justice Thomas emphatically rejected the notion that Congress could impose any law targeting those who are not law-abiding, or are unfit, irresponsible, or dangerous. *Id.* at 1944-45. Allowing Congress to "dictate what 'unfit' means and who qualifies" would render the historical understanding of the Second Amendment irrelevant. *Id.* at 1945. Justice Thomas chastised the government for trying to "cram its dangerousness test into our precedents." *Id.* "No matter how many adjectives the Government swaps out, the fact remains that the Court has never adopted anything akin to the Government's test." *Id.*

Much like the government's argument in *Rahimi*, *Jackson* claims that Congress can permanently disarm "citizens who are not law-abiding and are unwilling to obey the law," categories of persons who "presented an unacceptable risk of dangerousness," those "who deviated from legal norms," and those "who have demonstrated disrespect for legal norms of society." *Jackson*, 110 F.4th at 1127. Each of these purported standards are vague and unworkable in the same way as the "responsible" test asserted by the government in *Rahimi*.

**III.  This Nation's historical tradition of firearm regulation does not include dispossession of felons.**

There are no founding-era statutes barring all felons from possessing firearms. Neither the federal government nor a single state barred all felons from possessing firearms until the 20th century. *Range v. Attorney General*, 69 F.4th 96, 104 (3d Cir. 2023), certiorari granted, judgment vacated by *Garland v. Range*, 144 S. Ct. 2706, 219 L.Ed.2d 1313 (2024); *United States v. Bullock*, 679 F.Supp.3d 501, 505 (S.D. Miss. 2023) (federal felon-in-possession ban was not

enacted until 1938). Numerous law review articles document this fact.[1] Felons can only be disarmed if there is a tradition of distinctly similar analogues that have a comparable justification and impose a burden comparable to the permanent prohibition on firearm possession found in § 922(g)(1). There is no such tradition.

### A. The use of capital punishment or forfeiture.

*Jackson* claims that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property." *Jackson*, 110 F.4th at 1127. The 1790 Congressional Act *Jackson* cites punished only treason, "wilful murder," and piracy by death. An Act for the Punishment of Certain Crimes Against the United States (1790). Capital punishment was used sparingly and for so few crimes it cannot be said to support the permanent disarmament of all individuals punished by a year or more in prison. *Kanter v. Barr*, 919 F.3d 437, 458-462 (7th Cir. 2019) (Barrett, J., dissenting) (noting the differences in English common law and the laws in colonial America, which rapidly evolved such that capital punishment was used sparingly); *United States v. Jackson*, 85 F.4th 468, 473 (8th Cir. 2023) (Stras, J., dissenting from the denial of rehearing *en banc*) (explaining that the death penalty was rarely used, dispossession of firearms was never a punishment for commission of a crime, and forfeiture of arms applied only to the specific firearm used in the commission of a crime).

---

[1] See, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1375-76 (2009); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 708, 717 (2009); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 142, 155 (2007); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009).

That some felons would have been executed in the founding era does not establish a tradition of disarmament for those felons who were not executed. The pertinent inquiry is whether there were historical analogues permanently disarming felons after they served their terms of imprisonment.

**B. The state ratifying conventions rejected Second Amendment precursors with language somewhat akin to felon dispossession.**

Three states (Pennsylvania, Massachusetts, and New Hampshire) proposed constitutional amendments either prohibiting disarmament of "peaceable citizens" or authorizing disarmament of individuals "for crimes committed, or real danger of public injury from individuals" or those in "Actual Rebellion." Bernard Schwartz, *The Bill of Rights: A Documentary History*, Vol. II, p. 662, 665, 681, 712-13, 761 (1971). *Jackson* claims the Pennsylvania proposal supports disarmament of felons. 110 F.4th at 1126-27. None of these proposals passed and none of the language suggested made it into the Second Amendment. *Rahimi*, 144 S.Ct. at 1935-36 (Thomas, J. dissenting); *Jackson*, 85 F.4th at 475-76 (Stras, J., dissenting from the denial of rehearing *en banc*); *United States v. Harrison*, 654 F.Supp.3d 1191, 1209 (W.D. Okla. 2023) (a minority position "that failed to persuade its own state, let alone others … is too dim a candle to illumine the Second Amendment's scope").

That some states proposed amendments with language somewhat analogous to § 922(g)(1)'s ban on firearm possession by felons, and those proposals were *rejected*, is "surely … some probative evidence of unconstitutionality." *Bruen*, 142 S.Ct. at 2131; *see*, *Heller*, 554 U.S. at 590 ("It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process").

**C. Analogizing to statutes that disarmed groups other than felons also fails under *Bruen* due to a lack of similarity between the purported analogues and § 922(g)(1).**

*Jackson* relies on a mishmash of restrictions from various eras addressing various groups of people—Protestants, Catholics, Native Americans, hunters, those who refused to take loyalty oaths—none of which are remotely similar to § 922(g)(1). 110 F.4th at 1126-27. These disparate restrictions do not justify permanent dispossession of firearms for all felons.

In "Arming America: The Origins of a National Gun Culture," historian Michael Bellesiles claimed gun ownership was not commonplace in America before the civil war, and it was "heavily regulated." Joyce Lee Malcolm, "Review: Arming America," 79 Tex. L. Rev. 1657, 1658 (May 2001). As evidence of this purported heavy regulation, Bellesiles claimed that after the Second Amendment was ratified, states immediately imposed limitations on gun ownership on the groups mentioned in *Jackson*—Blacks, Catholics, Native Americans, and the foreign born. *Id*. at 1675.

In her excoriating review of Bellesiles' book and scholarship, Malcolm said, "Bellesiles seems to have forgotten that none of the 'great rights' declared in the Bill of Rights were granted to all inhabitants of the then United States; rather, they were limited to citizens and sometimes not to all citizens." *Id*.; *see also*, James Lindgren, "Fall From Grace: Arming America and the Bellesiles Scandal" 111 Yale L. J. 2195, 2197 (2002) (referring to the "almost unprecedented number of discrepancies, errors, and omissions" in Bellesiles' book). Thus, it appears that the "tradition" of gun regulation in America posited by Bellesiles and tacitly embraced in *Jackson* was nothing more than the exclusion of disfavored groups from "the people," a theory completely at odds with *Heller*'s holding that the right to bear arms is an individual right held by "all members of the community." *Heller*, 554 U.S. at 580; *supra* at 2-4. Felons are part of "the

16

people." *See*, *Rahimi*, 144 S.Ct. at 1933 (Thomas, J., dissenting) (Rahimi is undisputedly a part of "the people" because he is a member of the political community).

But even if Blacks, Native Americans, and other groups were prohibited from possessing firearms due to their perceived dangerousness rather than their lack of citizenship, a "dangerousness" test fails. Justice Thomas cogently explained the fallacy in such reasoning. *Id.* at 1946. Using colonial statutes that disarmed categories of people deemed to be threats, like slaves and Native Americans, to extrapolate a general rule that permits a modern-day Congress to disarm anyone deemed dangerous is obviously problematic. *Id.* "Far from an exemplar of Congress' authority, the discriminatory regimes the Government relied upon are cautionary tales. They warn that when majoritarian interests alone dictate who is 'dangerous,' and thus can be disarmed, disfavored groups become easy prey." *Id.* "[O]ne can easily imagine a world where political minorities or those with disfavored cultural views are deemed the next 'dangers' to society." *Id.* The Second Amendment prohibits such laws. *Id.*

*Jackson* goes even further, disarming anyone deemed dangerous or not adhering to legal norms, *and* prohibiting those individuals from making an as-applied challenge to § 922(g)(1) on the ground that they are not in fact dangerous. *Jackson* admits that § 922(g)(1) will deprive non-dangerous felons of their Second Amendment rights and wholeheartedly embraces giving Congress the indiscriminate power to strip the dangerous and non-dangerous of their firearms. 110 F.4th at 1128 ("there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons"). *Jackson* is also wrong because it misinterprets history and misapplies *Bruen* by failing to analyze whether the purported analogues it relies upon share comparable justifications and burdens with § 922(g)(1).

**1. Disfavored religious groups and political opponents.**

*Rahimi* flatly rejected the government's arguments that English laws imposing firearm restrictions against disfavored religious groups and political opponents were analogues that could justify the burdens imposed by § 922(g)(1). *Rahimi*, 144 S.Ct. at 1899. These English practices did not survive to the founding era. *Id*. Thus, *Jackson* misinterprets history and errs in analogizing firearm restrictions in England with § 922(g)(1).

The abusive practices in England, embodied in the Militia Act of 1662 and the English Bill of Rights, fueled the colonists' desire for a constitutionally protected right to keep and bear arms. *Frein v. Pennsylvania State Police*, 47 F.4th 247, 255 (3d Cir. 2022). When the Crown attempted to disarm colonists the way it disarmed its subjects, it triggered the Revolutionary War. *Id*. The Second Amendment was a rebuke to the English Bill of Rights, which gave Parliament unlimited power to regulate guns. When James Madison introduced the Bill of Rights, he noted how it differed from England's laws, specifically noting that in England gun rights could be circumscribed by a "mere act of parliament." Stephen P. Halbrook, *The Founder's Second Amendment* 252 (2008). "Madison … criticized the European monarchical practice of being 'afraid to trust the people with arms.'" *Harrison*, 654 F.Supp.3d at 1218.

Revolutionary War and colonial era statutes disarming those who would not swear loyalty oaths or were "disaffected to the cause of America" were meant to neutralize those who might undermine the newly formed government because of their loyalty to Great Britain. See, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 at 263-265 (2020) ("As in England, those disloyal to the government were the focus of most prohibitions throughout the colonial period…. Like the English, and out of similar concerns of violent insurrectionists, the colonists disarmed those who might rebel against them"). Statutes demanding loyalty oaths were concerned with the violent

overthrow of government and did not share a comparable justification with § 922(g)(1), which is justified as a need to prevent crime and interpersonal violence.

### 2. Native Americans

As noted above, in the founding era, Native Americans were not citizens and, therefore, not part of "the people" protected under the Second Amendment. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994) ("[n]either the Indian nor the slave was a citizen, therefore neither was entitled to the rights of English subjects"); *Harrison*, 654 F.Supp.3d at 1216. Restrictions against Native Americans and felons are not analogues because they are not comparably justified.

### 3. Hunting ordinances

*Jackson* cited *two* hunting ordinances that called for forfeiture of firearms for non-violent hunting offenses. 110 F.4th at 1127. *Jackson* does not say whether the forfeiture applied to all of the hunter's firearms or just the one used in the offense. Nor does *Jackson* say whether dispossession was permanent. Checking the first hunting regulation source reveals that the ordinance prohibited firing a gun in the city "on pain of forfeiting *the gun*," not all guns owned by the offender. Laws and Ordinances of New Netherland, 1638-1674 at p. 138.

The second hunting regulation required "idle and disorderly Persons, who have no settled Habitation" to produce a certificate to a Justice of the Peace stating that the person planted and tended "Five Thousand Corn Hills" in the preceding year. Act of April 20, 1745, ch. III, 23, The State Records of North Carolina, p. 218-19. If such a person could not produce a certificate, he forfeited his gun and paid a fine "for every such Offence." *Id*. The wording implies the offender had to forfeit a gun each time he was caught illegally hunting, not that he forfeited all guns at the

time of the initial offense.  *Id*.  Offenders who had a "settled Habitation" were merely fined and did not forfeit their firearm.  *Id*.

Other hunting regulations did not provide for forfeiture, and instead imposed fines, proving a lack of historical consensus.  For example, an 1833 Ohio ordinance *fined* any person who discharged a firearm within one-quarter mile of a city, a penalty far less harsh than lifetime dispossession.  1 Statutes of Ohio & Northwestern Territory 106 (Salmon P. Chase., 1833).  And the ordinance contained an exception saying it did not apply to using firearms for self-defense, defense of another, or defense of property.  *Id*. These hunting regulations are by no means analogues of § 922(g)(1).

**D.  This random assortment of restrictions does not justify a lifetime ban on firearm possession by felons.**

Just as the surety laws and "going armed" laws analyzed in *Rahimi* only supported temporary disarmament, the laws aimed at punishing political disloyalty and hunting violations did not impose burdens comparable to § 922(g)(1)'s lifetime ban.  *Rahimi*, 144 S.Ct. at 1903 ("we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be *temporarily* disarmed consistent with the Second Amendment") (emphasis added).  For example, those who participated in Shay's Rebellion in Massachusetts were disarmed, but only for three years.  Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, Wyoming Law Review, Vol. 20: No. 2, Article 7 at 268.  The Massachusetts colony enacted a law disarming those expressing "seditious libel," but if the disarmed individuals admitted their libel, they could have their weapons returned.  Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law and Contemporary Problems 55, 72 (2017).

Many courts have performed careful historical analysis demonstrating that firearm prohibitions were not permanent. *See, e.g., United States v. Prince*, 700 F.Supp.3d 663, 670-73 (N.D. Ill. 2023) (concluding that the historical record shows Protestants, Catholics, and those who would not swear loyalty oaths could regain their Second Amendment rights while § 922(g)(1) offers no similar opportunity to felons); *Williams v. Garland*, 2023 WL 7646490 at *4-5 (E.D. Pa. 2023) (permanent disarmament of a felon with a driving while intoxicated conviction did not impose burden comparable to that imposed by historical statutes that only temporarily disarmed intoxicated individuals); *United States v. Quailes*, 688 F. Supp. 3d 184, 199-200 (M.D. Pa. 2023) (even if historical regulations were sufficiently relevant and numerous to establish a tradition of disarming the dangerous, the government did not explain "the 'how' of each regulation—such as the length of time the individuals were disarmed'"); *United States v. Cherry*, 23-CR-30112-SMY at * 9 (S.D. Ill. Feb. 1, 2024) (those thought to be disloyal could regain their right to bear arms); *United States v. Williams*, 718 F.Supp.3d 651, 677 - 78 (E.D. Mich. 2024) (Catholics, enslaved people, Native Americans were not subjected to permanent and absolute bans on firearm possession but could possess firearms under certain circumstances); *United States v. Neal*, 715 F. Supp. 3d 1084, 1102 (N.D. Ill. 2024) (explaining that in the Founding era felons could possess firearms after serving their sentences and not all felons were put to death or subject to estate forfeiture).

**IV.  Section 922(g)(1) is unconstitutional on its face.**

As the preceding sections discussed, historical statutes provided for temporary disarmament and mechanisms existed by which the right to possess a firearm could be restored. Surety statutes had exceptions allowing even those found to be dangerous to retain their firearms. *Rahimi*, 144 S.Ct. at 1900 ("Bonds could not be required for more than six months at a time, and

an individual could obtain an exception if he needed his arms for self-defense or some other legitimate reasons").  Section 922(g)(1) has no exceptions; it is a blanket, lifetime prohibition with no procedural mechanism for restoration of the right to bear arms.  It prohibits possession of a firearm for all purposes, even self-defense or defense of others, and in all places, including an individual's home, vehicle, or person.

Facial challenges are appropriate where a statute, like § 922(g)(1), "define[s] no central core of constitutionally regulable conduct," and its scope is "subject to the uncertainties and vagaries of prosecutorial discretion."  *New York v. Ferber*, 458 U.S. 747, 771, n. 26 (1982).  The felon-in-possession statute does not "aim specifically at [the] evils" it purports to address but is scattershot and haphazard sweeping legitimate conduct within its scope.  *Id.*

In *United States v. Stevens*, 559 U.S. 460, 482 (2010), the Supreme Court analyzed a federal statute that criminalized depictions of animal cruelty and found it facially invalid due to its substantial overbreadth.  The federal statute criminalized the creation, sale, or possession of depictions of animal cruelty if done for commercial gain.  *Id.* at 464-65.  The definition of animal cruelty included any depiction of a living animal being wounded or killed.  *Id.* at 464-65.  An exception was made for depictions having "serious religious, political, scientific, educational, journalistic, historical or artistic value."  *Id.* at 465.  The Court concluded the statute was of "alarming breadth," with a substantial number of its applications involving no cruelty to animals. *Id.* at 474.

The government invited the Court to interpret the statute more narrowly, but the Court declined, finding the text to contain "little ambiguity."  *Id.*  The Court said it could not rewrite a law to conform it to constitutional requirements.  *Id.* at 481.  A court may impose a limiting

construction on a statute only if the statute is readily susceptible to such a construction. *Id*. Rewriting a statute would be a "serious invasion of the legislative domain." *Id*.

The same reasoning applies here. Other circuits have long recognized that "§ 922(g)(1) may be susceptible to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent." *United States v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010). The Ninth Circuit has said "there are good reasons to be skeptical of the constitutional correctness of categorical, lifetime bans on firearm possession by *all* felons." *United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016) (emphasis in the original). In *Phillips*, the court noted that Congress or state legislatures could define petty larceny as a felony, but it remained to be seen if "a conviction for stealing a lollipop [could] then serve as a basis under § 922(g)(1) to ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment." *Id*. at 1176, n. 5.

A court undoubtedly has the power to determine whether § 922(g)(1) is unconstitutional as written. But it cannot rewrite the statute to conform it to the scope of the Second Amendment as determined by historical tradition. Nor could a court only apply the statute to dangerous felons or to those who served life in prison or been executed at the time of the founding.

"Only the people's elected representatives in the legislature are authorized to 'make an act a crime.'" *United States v. Davis*, 588 U.S. 445, 451 (2019), quoting *United States v. Hudson*, 7 Cranch 32, 34, 11 U.S. 32, 3 L.Ed. 259 (1812). Courts may "interpret ambiguous statutes to avoid rendering them unconstitutional," and sometimes to "construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality." *Id*. at 463, n. 6. But here, the statute is not ambiguous, and there is no interpretive role for a court to play.

Assigning judicial power to life-tenured judges "would have made little sense if judges could usurp lawmaking powers vested in periodically elected representatives." *Loper Bright Enterprises*, 144 S.Ct. at 2278 (2024) (Gorsuch, J., concurring). Restraining judges from assuming a lawmaking role protects the due process guarantee of fair notice. *Id*. at 2285 (Gorsuch, J., concurring). If judges could change the law on a whim, the people could never "be sure of the rules that bind them." *Id*.; *Rahimi*, 144 S.Ct. at 1909 (discerning the original meaning of the Constitution "at least keeps judges in their proper lane").

In *Rahimi*, Justice Kavanaugh emphasized the need for judges not to act as legislators. Justice Kavanaugh explained that means-end scrutiny and subjective balancing tests could not be used to determine the scope of the Second Amendment because those approaches vested judges with the power to second-guess legislators, and courts' pronouncements under those modes of analysis were "uncomfortably like legislation." *Id*. at 1921, citing A. Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1185 (1989).

While Congress has the power to make an act a crime, it does not have *carte blanche*. If overbreadth challenges are prohibited in the Second Amendment context, then Congress has "unreviewable power to manipulate the Second Amendment" by affixing the "felony" label to whatever offense it chooses. *United States v. Harrison*, 654 F.Supp.3d 1191, 1205 (W.D. Okla. 2023). That kind of unbridled power would be "inconsistent with the entire point of constitutionalizing a fundamental right in the first place: to restrain a legislature's ability to infringe that right through legislation." *Id*. at 1205-06.

The Court did not describe the challenge in *Bruen* as a facial challenge, but it effectively struck down New York's firearm licensing scheme on its face insofar as permit applicants were required to prove a "special need" for self-protection distinguishable from that of the general

community before being allowed to carry handguns in public. *Bruen*, 597 U.S. at 12, 70. *Bruen* explicitly decried categorical restrictions that would apply "far too broadly" and "eviscerate the general right to publicly carry arms for self-defense." *Id.* at 26, 31.

Section 922(g)(1) denies millions of nonviolent felons and felons with decades old convictions their Second Amendment right to keep and bear arms and is substantially overbroad and unconstitutional on its face. The statute contains no procedural mechanism by which a felon could regain his or her right to possess firearms and violates the Fifth Amendment right to procedural due process. A court-created limiting construction such as "dangerousness" invites other constitutional challenges. A "dangerousness" test would be void for vagueness because it would not provide fair notice and would permit arbitrary enforcement. And interpreting the statute, where no interpretation is required given its unambiguous application to any felon, to narrow its scope would violate the separation of powers doctrine. *See*, *Davis*, 588 U.S. at 470 (options on how to rewrite the residual clause of 18 U.S.C. 924(c) "belong to Congress to consider; no matter how tempting, this Court is not in the business of writing new statutes to right every social wrong it may perceive"). Section 922(g)(1) is unconstitutional on its face.

### V.  The statute is unconstitutional as applied to Mr. Mangol.

Mr. Mangol purportedly has these convictions: felony property damage on February 1, 2018 in Clay County, Missouri case number 16CY-CR03132-01; and tampering with a motor vehicle on February 1, 2018 in Clay County, Missouri case number 17CY-CR01126-01. (Doc. 1-1 ¶ 13). He is accused in this case of conspiracy to distribute fentanyl, possession of fentanyl, and felon in possession of firearms. (Doc. 4). The evidence seized in this matter was seized from 4801 Independence Avenue, Apartment 2E, Kansas City, Missouri. This apartment housed the defendants. (Doc. 1-1 ¶ 4). These weapons were in the home for self-defense. Living in a

dangerous city, it is reasonable to have guns in the home to defend yourself and your family.[2]

With Mangol's history of mere property related offenses, it is unreasonable to divest Mangol from his right to defend himself and his family. The investigation by law enforcement focused on allegations of drug activity, not weapons offenses. The weapons were discovered in the bedroom of the apartment and the hallway, both places a reasonable person would store a firearm for self-defense.

Several courts have sustained pre-trial, as-applied constitutional challenges to 18 U.S.C. § 922(g)(1), considering the existence of the defendant's prior convictions but not their underlying facts. *See e.g.*, *United States v. Bullock*, 679 F.Supp.3d 501, 537 (S.D. Miss. June 28, 2023) (dismissing indictment against a defendant with prior felony convictions for aggravated assault and manslaughter); *United States v. Harper*, 689 F.Supp.3d 16, 35 (M.D. Pa. 2023) (dismissing indictment against defendant with thirteen prior felony convictions including multiple armed robberies and drug trafficking); *United States v. Quailes*, 688 F.Supp.3d 184, 200 (M.D. Pa. 2023) (dismissing indictment against defendant with four prior convictions for possession with intent to distribute cocaine and heroin); *United States v. Forbis*, 687 F.Supp.3d 1170, 1178-79 (N.D. Okla. 2023) (dismissing indictment against defendant with felony convictions for possession of controlled substances and driving under the influence).

*Rahimi* left undecided whether groups of people can be categorically excluded from Second Amendment protection, and *Jackson* was incorrectly decided. It is the government's

---

[2] See CrimeReports.com, https://cityprotect.com (search 64124 zip code; then search "incidents" hyperlink and filter for date range; then follow "See Results" hyperlink.)(detailing the crime committed organized by severity in the relevant zip code); *The Safest and Most Dangerous Places in 64124, MO: Crime Maps and Statistics*, CrimeGrade.org, https://crimegrade.org/safest-places-in-64124/ (last visited January 30, 2025)(grading "F" for overall crime grade of Kansas City Missouri in the 64124 zip code and providing data in support).

burden to prove at a hearing that disarming defendant would fit within the historical tradition of disarming dangerous individuals. Defendant is not dangerous, nor are his prior felony convictions. The government cannot establish an historical tradition of prohibiting the possession of firearms after a felon served his term of imprisonment, especially where a firearm is not used, but is merely possessed in the individual's home or carried on his person for self-defense.

WHEREFORE, Mr. Mangol asks this Court to grant his motion to dismiss count eight of the superseding indictment with prejudice.

Respectfully Submitted,

SANDAGE LAW LLC

/s/ Laura O'Sullivan
Laura O'Sullivan, MO #41318
1600 Genessee Street, Suite 662
Kansas City, MO 64102
phone 816.753.0800
fax  816.735.4602
email laura@sandagelaw.com

ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

On March 11, 2025, I served this document by depositing an electronic copy of it in the Court's electronic filing system, which shall distribute notice to all attorneys of record.

/ s/ Laura O'Sullivan
Laura O'Sullivan