**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 24-00037-01-CR-W-SRB |
| | ) | |
| JOHNSON A. MANGOL, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Before the Court is Magistrate Judge W. Brian Gaddy's Report and Recommendation

(Doc. #78) to deny Defendant Johnson A. Mangol's ("Defendant") Motion to Suppress

(Doc. #54). Defendant filed a timely objection to the Report and Recommendation.

After an independent and careful review of the record, the applicable law, and the parties'

arguments, the Court ADOPTS Judge Gaddy's Report and Recommendation (Doc. #78). It is

ORDERED that Defendant's Motion to Suppress (Doc. #54) is DENIED. It is further

ORDERED that the Report and Recommendation be attached to and made a part of this Order.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH, JUDGE
UNITED STATES DISTRICT JUDGE

Dated: July 9, 2025

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 24-00037-01-CR-W-SRB |
| | ) | |
| JOHNSON A. MANGOL, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending is Defendant Johnson A. Mangol's Motion to Suppress filed on January 13, 2025. Doc. 54. On January 27, 2025, the Government filed its opposition to the motion. Doc. 55. Defendant filed his reply on February 10, 2025. Doc. 58. For the reasons set forth below, the undersigned recommends Defendant's motion to suppress be **DENIED**.

## I.        PROCEDURAL BACKGROUND

On February 6, 2025, the grand jury returned a superseding indictment charging Defendant Johnson A. Mangol with one count of possession with intent to distribute alprazolam in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(2); four counts of distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); one count of conspiracy to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; one count of possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and one count of being a felon in possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Doc. 56.[1]

---

[1] The superseding indictment was filed after Defendant filed his motion to suppress. *See* Doc. 54. The initial indictment charged him with conspiracy to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; possession with intent to distribute fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Doc. 4. The superseding indictment added charges of possession with intent to distribute alprazolam in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(2), and four counts of distribution of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Doc. 56.

In the pending motion, Defendant moves to suppress all evidence derived from a search of his apartment on January 26, 2023.  Doc. 54 at 1.  Specifically, Defendant contends the search warrant was not supported by probable cause, the good-faith doctrine does not apply, and as a result, all evidence obtained from the search should be suppressed as fruit of the poisonous tree.  *Id*. at 1, 4-10.  The Government contends no evidence should be suppressed because the search warrant was supported by probable cause, and alternatively, the good-faith exception applies.  Doc. 55 at 3-6.  Government counsel requested oral argument on Defendant's motion and insisted there was "likely no need for a hearing as the Court can make its ruling solely based on its review of the [Search Warrant] Application."  *Id*. at 2.  Defense counsel agreed.[2]

On March 5, 2025, the undersigned held oral arguments.  Docs. 65-66.  The parties stipulated there are no disputed facts, and the undersigned's report and recommendation on the issue of probable cause should be based solely on the information provided in the four corners of the Search Warrant Application.  Doc. 66 at 2-4.  However, Government counsel stated the Court may find it necessary to present evidence on the good-faith issue.   Doc. 66 at 30-31.  Defense counsel indicated the Court could make a determination without an evidentiary hearing.  *Id*. at 31.

On April 9, 2025, the Court held an evidentiary hearing solely on the good-faith issue.  Docs. 72, 75.  Defendant was present and represented by CJA counsel Laura O'Sullivan.  *Id*.  The Government was represented by Assistant United States Attorney Jeffrey McArthur.  *Id*.  At the hearing, one witness testified: Detective Michael Wells.  Doc. 72; Doc. 75 at 4-37.  One exhibit was admitted.  Docs. 72-73.

---

[2] On February 11, 2025, the parties appeared for Defendant's arraignment on the superseding indictment.  Doc. 60.  During the hearing, defense counsel agreed no evidentiary hearing was necessary and the undersigned's report and recommendation should be based on a "four corners" review of the Search Warrant Application.

## II.     FACTUAL BACKGROUND

### A.     Search Warrant Application[3]

Detectives with the Missouri Western Interdiction and Narcotics ("MOWIN") Task Force conducted surveillance at 4801 Independence Avenue in Kansas City, Missouri on numerous occasions in December 2022 and January 2023.  Ex. 1 at 1.  Defendant was reportedly selling fentanyl from his residence, Apartment 2E at 4801 Independence Avenue.  *Id*.  This address was listed as Defendant's residence with the Missouri Department of Revenue and in numerous police reports.  *Id*.

While surveilling the location on January 10, 2023, detectives observed Defendant exit a common door that led to his apartment at approximately 11:45 a.m.  *Id*.  He walked south through the rear parking lot, across an alley, and through a vacant residential lot to 6th Street.  *Id*.  Once he was on 6th Street, he entered the front passenger seat of a small grey sedan ("the sedan") occupied by a white female driver.  *Id*.  Both Defendant and the female remained in the sedan for approximately five minutes.  *Id*.

A grey Honda Civic ("the Honda") arrived on 6th Street and parked behind the sedan.  *Id*.  Defendant exited the sedan and acknowledged the Honda's driver with a hand gesture.  *Id*.  Defendant then walked back to his apartment building and entered the common door that led to his apartment.  *Id*.  The driver of the Honda drove around the block and pulled into the rear parking lot of Defendant's apartment building.  *Id*.  Defendant stayed inside the building for approximately five minutes.  *Id*.  When he exited, he motioned the Honda's driver back over to 6th Street.  *Id*.

---

[3] Because the parties stipulated an evidentiary hearing was not necessary to determine whether probable cause existed, all information in this section is from the Search Warrant Application admitted during the April 9, 2025 hearing as Government's Exhibit 1.  Docs. 72-73.  Defendant and Government counsel also attached the Search Warrant Application to their briefings in this matter.  *See* Doc. 54-1; Doc. 55-1.  To simplify, the undersigned refers to the Search Warrant Application as Exhibit 1 in this report.  In addition, although the parties use the words application and affidavit interchangeably when referring to the Search Warrant Application, the undersigned refers to it as the Search Warrant Application.

Again, Defendant walked through the alley and vacant lot to 6th Street. Ex. 1 at 1. Once on 6th Street, Defendant made contact with an unknown occupant in a black Audi ("the Audi") that had arrived and parked at the curb. *Id*. Defendant entered the Audi's front passenger seat and remained inside for approximately thirty seconds before exiting. *Id*. The Audi left the area. *Id*. Defendant next entered the front passenger seat of the Honda. *Id*. He remained inside the Honda for no more than one minute before exiting. *Id*. The Honda then drove away eastbound. *Id*. Defendant returned to the front passenger seat of the small grey sedan. *Id*.

According to Detective Wells, it appeared to law enforcement that Defendant was conducting hand-to-hand drug transactions. *Id*. Consequently, detectives had uniformed officers move into the area. *Id*. Officers located and stopped the Honda near Independence Avenue and Denver. *Id*. Officers contacted the Honda's driver and sole occupant. *Id*. While officers were speaking with the driver, they observed "narcotics contraband" in plain view protruding from the right pocket of his sweatpants. *Id*. Officers removed the contraband from his pocket and discovered what appeared to be a crushed white pill wrapped in aluminum foil. *Id*. The substance was tested and confirmed to contain fentanyl, which is what Defendant was reportedly selling from his apartment. *Id*.

On January 17, 2023, detectives observed Defendant meet with a white female in a small grey sedan parked on 6th Street.[4] *Id*. at 2. The meeting lasted a few minutes. *Id*. According to Detective Wells, the meeting was consistent with a hand-to-hand drug transaction. *Id*. Once the contact was complete, Defendant immediately returned to his apartment. *Id*.

On January 19, 2023, Detective Michael Wells applied for a warrant to search Defendant's apartment. *Id*. at 1-2. In the application, Detective Wells detailed the interactions observed on January 10 and January 17, 2023. *Id*. Based on his experience, including twelve years of investigating

---

[4] It is unclear whether the small grey sedan observed on January 17, 2023 was the same one observed on January 10, 2023. *See* Ex. 1.

drug crimes, the detective believed Defendant was engaging in a pattern of drug trafficking from his apartment. Ex. 1 at 1. According to Detective Wells, Defendant's "pattern was to have people meet him on 6th Street," and "[o]nce the customer arrived, and parked on 6th Street, [Defendant] would exit his apartment with the drugs." *Id*. at 1-2. Then, Defendant "walked through an alleyway and contacted the customer on 6th Street" and "usually entered the front passenger seat of the customer's vehicle and exited a brief moment later." *Id*. "The customer would drive away from the area and [Defendant] would return to his apartment." *Id*. Detective Wells noticed Defendant did not conduct any "meetings at his apartment or in the lot." *Id*. at 1. Instead, Defendant had "people meet him on 6th Street, which was consistent with trying to prevent people in his apartment building from seeing the illegal activity he was engaged in." *Id*.

Detective Wells stated "[i]t appeared [Defendant] was conducting hand-to-hand drug transactions." *Id*. at 1. Based on his observations and experience, the detective believed Defendant had pills and United States currency from trafficking fentanyl in his apartment. *Id*. at 2. In the Search Warrant Application, Detective Wells described the place to be searched as follows:

> An apartment inside of 4801 Independence Avenue, Kansas City, Jackson County, MO. It is a two story brick structure with businesses on the first floor and apartments on the second floor. Access to the apartment to be searched is gained by responding to the rear, south side of the building, entering the western most south facing door, ascending the stairwell to the second floor, immediately turn left at the top of the stairwell and enter the south facing door.

*Id*.

Detective Wells stated the bottom floor of the building contains a cellphone store and a smoke shop business, and the second floor has two apartments. *Id*. He explained Kansas City, Missouri Police Department ("KCPD") officers had "been inside of [Defendant's] apartment on numerous occasions over the last few months," and from watching their body camera footage he "was able to see clearly how to get to [Defendant's] apartment from the rear common entry door." *Id*. Upon entering the building, one must turn right and go up a flight of stairs. Ex. 1 at 2. At the top of the

stairs, there is a small common area with a washer and dryer. *Id*. There is a south facing door, and an east facing door. *Id*. The south facing door led to Defendant's apartment. *Id*. No apartment numbers appeared on the doors. *Id*. Detective Wells listed the following as items to be seized: fentanyl, a schedule II controlled substance; drug paraphernalia and packaging; proof of occupancy; and U.S. currency close in proximity to illegal narcotics. *Id*.

At the time the Search Warrant Application was submitted, Defendant was on probation in the State of Missouri for tampering with a motor vehicle and damaging jail property. *Id*. He was also out on bond related to a July 9, 2020 arrest on charges pending in Jackson County, Missouri for possession of 143 alprazolam pills and three MDMA capsules. *Id*.

**B.     Issuance of Search Warrant and Search of Defendant's Residence**

On January 19, 2023, Jackson County Associate Circuit Court Judge Janette Rodecap found the Search Warrant Application contained probable cause and issued a search warrant for Defendant's apartment. Ex. 1 at 3. She issued the warrant for the search of Defendant's apartment as described in the application and for the materials listed in the application. *Id*.; *see supra*, section II(A). The search warrant was executed on January 26, 2023. Ex. 1 at 3. The return listed "fentanyl, paraphernalia, firearms, [and] ammunition" as the property seized. *Id*.

**C.     Testimony of Detective Michael Wells**

Since 2018, Detective Michael Wells has worked in KCPD's Drug Trafficking Squad. Doc. 75 at 6, 25-26.[5] KCPD's Drug Trafficking Squad is part of the MOWIN Task Force with members from other local law enforcement agencies. *Id*. at 7, 25-26. A Platte County detective notified

---

[5] For more than twenty-three years, Detective Michael Wells has been a law enforcement officer with KCPD. Doc. 75 at 4. When he became a detective roughly eighteen years ago, Detective Wells attended "detective school" and specialized training classes, and shadowed a detective. *Id*. at 4-5. He also received training on how to conduct drug investigations. *Id*. at 24-25. For two years, he was assigned to the Street Narcotics Unit during which he investigated drug crimes and worked in an undercover capacity purchasing narcotics. *Id*. at 5, 25. He also worked in the Property Crimes Unit, Assault Squad, and Illegal Firearms Squad, which all frequently involved narcotics investigations. *Id*. at 5-6. During his entire tenure as a KCPD detective, Detective Wells's work involved drug trafficking investigations. *Id*. at 6.

Detective Wells of Defendant's alleged connection to an overdose death in Platte County. *Id*. at 7-8.[6]  After reviewing police reports, Detective Wells learned Defendant had previous contacts in Kansas City and was involved in a prior narcotics arrest. *Id*. at 8-9.

Detective Wells initiated an investigation on Defendant. *Id*. at 9.  As part of the investigation, law enforcement surveilled 4801 Independence Avenue and coordinated drug purchases from Defendant using a confidential informant.[7] *Id*. at 9-12.  Detective Wells testified that law enforcement also conducted a car stop of an individual, the Honda's driver, whom they believed had purchased drugs from Defendant. *Id*. at 10, 12.  Two grams of fentanyl were located during the car stop. *Id*. at 12.[8]

Detective Wells contacted the Jackson County Prosecutor's Office and described the course of the investigation.  Doc. 75 at 16, 19.  He explained to the prosecutor that he wanted to obtain a search warrant for Defendant's apartment, but he also wanted to protect the confidential informant's identity. *Id*.  Detective Wells believed there was sufficient probable cause based on the surveillance and car stop, without including the confidential informant buys. *Id*. at 16.  The prosecutor agreed with the detective. *Id*.

Detective Wells drafted a Search Warrant Application containing the information discussed *supra*, section II(A).  Ex. at 1; Doc. 75 at 10, 16-17.  According to Detective Wells, he made no false statements in the Search Warrant Application, nor did he include any statement to knowingly and

---

[6] The Search Warrant Application does not mention Defendant's alleged connection to an overdose death in Platte County. *See* Ex. 1.

[7] The Search Warrant Application does not mention law enforcement coordinating drug purchases from Defendant using a confidential informant. *See* Ex. 1; Doc. 75 at 27-28.  Detective Wells testified he did not include information regarding the confidential information in the Search Warrant Application to protect the informant's identity.  Doc. 75 at 16, 27.

[8] According to Detective Wells, the Honda's driver was taken to the police department.  Doc. 75 at 28.  He invoked his right to remain silent and did not implicate Defendant, or anyone else, in providing him with the fentanyl located during the stop. *Id*. at 28-29.  This information was not included in the Search Warrant Application. *Id*. at 29-30; *see also* Ex. 1.

intentionally, or with reckless disregard for the truth, mislead the reviewing judge. Doc. 75 at 19. Detective Wells submitted the Search Warrant Application to the prosecutor. *Id*. at 16-17.

After submitting the application to the prosecutor, Detective Wells received a call from Judge Rodecap. *Id*. at 16-18. Judge Rodecap swore Detective Wells in, told him she was getting ready to review the search warrant, and informed him she would call him back if she had any questions. *Id*. at 18. Judge Rodecap never called him back, and Detective Wells received a signed search warrant. *Id*. Detective Wells testified he has had "multiple search warrants" assigned to Judge Rodecap in the past. *Id*. He confirmed there has never been any indication of Judge Rodecap abandoning her judicial role in reviewing or issuing search warrants. *Id*. at 19.

Detective Wells testified it is his understanding that when a judge signs and issues a search warrant, the judge also believes there is sufficient probable cause for the search. *Id*. at 19. When he received the signed search warrant from Judge Rodecap, Detective Wells believed the search warrant was in proper order, and there was sufficient probable cause. *Id*. at 19-22. And nothing about the warrant appeared to be facially deficient to him. *Id*. at 20. He testified that roughly ten officers helped execute the search warrant, and none of those officers raised an issue with the search warrant. *Id*. at 21-22. Detective Wells attested he executed the search warrant in good faith, believing he had probable cause to conduct the search in question. *Id*.

## III. DISCUSSION

Defendant asserts the Search Warrant Application did not establish probable cause for the search of his apartment. Doc. 54 at 4-8. He also argues the good-faith exception to the exclusionary rule does not apply, and all evidence and statements derived from the search of his apartment should be suppressed as fruit of the poisonous tree. *Id*. at 8-10. The Government contends the Search Warrant Application established probable cause for the search of Defendant's apartment, and alternatively, law enforcement acted in good faith in executing the search warrant. Doc. 55 at 3-6.

**A.      Probable Cause**

The Fourth Amendment provides in relevant part "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "Probable cause exists when the totality of circumstances shows 'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Ivey*, 91 F.4th 915, 917 (8th Cir. 2024) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Probable cause is a "fluid concept" which "turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 231-32.  It is a "practical, nontechnical conception."  *Id.* at 231 (citation omitted).  "Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [judge's] decision" regarding probable cause.  *Id.* at 235.

The Supreme Court has emphasized that "after-the-fact scrutiny by courts of the sufficiency of a [search warrant] affidavit should not take the form of *de novo* review."  *Id.* at 236.  "The preference for [search] warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination" of probable cause.  *United States v. Leon*, 468 U.S. 897, 914 (1984) (citation omitted).  This Court's role in reviewing another judge's probable cause determination is "to ensure that the issuing judge 'had a substantial basis for concluding that probable cause existed.'"  *United States v. Juneau*, 73 F.4th 607, 614 (8th Cir. 2023) (quoting *United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017)).

When an issuing judge relied solely on an affidavit in reaching a probable cause determination, the reviewing court's consideration is limited to the information "found within the four corners of the

affidavit." *Id.* (citing *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003)).[9] In determining whether probable cause exists, an issuing judge may "draw reasonable inferences from the totality of the circumstances." *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017). "Probable cause is not a high bar," and a reviewing court must pay "great deference" to an issuing judge's probable cause determination. *Juneau*, 73 F.4th at 614 (citations omitted).

### 1. Corroboration of Defendant's Reported Illegal Activity

Defendant contends the Search Warrant Application lacked probable cause because it did not include evidence corroborating his possession or distribution of drugs. Doc. 54 at 4-6; Doc. 66 at 5-6. He specifically questions whether the issuing judge could rely on the detective's statement that Defendant was "reportedly selling fentanyl from his apartment." Doc. 66 at 25; *see also* Ex. 1 at 1. Defendant avers the Search Warrant Application provided no information about what "reportedly" means, did not explain who reported this, and contained no information corroborating the report. Doc. 66 at 25.

The Search Warrant Application states Defendant "was reportedly selling fentanyl from his apartment." Ex. 1 at 1. However, Defendant is correct that it does not state who reported this activity, nor does it provide any additional information about the reported activity. The application does not provide whether Defendant's reported selling of fentanyl came from an anonymous source or not. *See* Ex. 1 at 1. However, because the application does not say anything about who reported this activity, the undersigned believes an anonymous tip is analogous.

In probable cause determinations, "[a] tip received from an anonymous informant requires '[s]omething more,' usually in terms of independent police corroboration, before probable cause may

---

[9] As noted above, significant facts were omitted from the Search Warrant Application by Detective Wells, including the use of a confidential informant and controlled buys of drugs from Defendant. Because a probable cause determination involves a "four corners" review of the Search Warrant Application, these additional facts cannot be considered in the probable cause analysis. Although not dispositive in this case, the undersigned questions the practice of omitting key facts from a search warrant application, including facts that would clearly support a probable cause determination.

arise." *United States v. Nolen*, 536 F.3d 834, 840 (8th Cir. 2008) (citation omitted); *see also United States v. Doty*, 714 F.2d 761, 763-64 (8th Cir. 1983) (finding an issuing judge could rely on an anonymous telephone tip that was corroborated by law enforcement's investigative efforts). Independent police corroboration of a tip creates a "permissible inference that the informant is reliable." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). "Even the corroboration of minor, innocent details" can support a probable cause finding. *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (citation omitted).

Federal courts have found anonymous tips of drug dealing were sufficiently corroborated by police observations of suspected drug transactions. *See United States v. Stevens*, No. 20-3357, 2022 WL 19200, at *2 (3d Cir. Jan. 3, 2022) (finding sufficient probable cause for search of a defendant's residence where an anonymous tip about the defendant being a drug dealer was corroborated, in part, by police observing a man leave the residence and engage in a hand-to-hand drug transaction); *United States v. Vargas*, 931 F.2d 112, 114 (1st Cir. 1991) (finding probable cause for search of a defendant's apartment because police observed numerous individuals visit the defendant's apartment for short periods of time, which corroborated an anonymous tip about him distributing drugs from his apartment); *United States v. Joye*, 454 F. Supp. 3d 675, 684-85 (E.D. Mich. 2020).

Here, the Search Warrant Application details law enforcement's confirmation of Defendant's residential address and subsequent surveillance around his apartment in December 2022 and January 2023. While surveilling the area, detectives observed Defendant engaging in what they believed was a pattern of hand-to-hand drug transactions on multiple occasions. Before, during, and after these transactions, law enforcement witnessed Defendant entering and/or exiting his apartment building. Additionally, as stated in the application, officers found one individual, shortly after a brief interaction with Defendant, who possessed fentanyl, which is the drug Defendant was reportedly selling from his apartment.

Showing deference to the issuing judge's determination of probable cause, the undersigned recommends the Court find the averment that Defendant was "reportedly selling fentanyl out of his apartment" to be sufficiently corroborated by independent police surveillance resulting in observations of Defendant engaging in what appeared to be a pattern of hand-to-hand drug transactions, and law enforcement finding an individual possessing fentanyl shortly after interacting with Defendant.

### 2. Nexus Between Defendant's Alleged Drug Trafficking Activity and Residence

Defendant argues the Search Warrant Application did not set forth probable cause because it failed to establish a nexus between his alleged involvement in drug distribution and his apartment. Doc. 54 at 6-8.  For proper issuance of a warrant, "there must be evidence of a nexus between the contraband [sought] and the place to be searched."  *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citation omitted); *see also United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009).  The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence.  *United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999).

Here, the Search Warrant Application detailed the connection between Defendant's alleged drug trafficking activity and his residence.  The application explained detectives surveilled the area around Defendant's apartment because he was reportedly selling fentanyl from it.  On multiple occasions, detectives observed Defendant leave his apartment building, walk through an alley to 6th Street, enter different vehicles for short periods of time, and then return to his apartment building. *See supra*, section II(A).  Based on his training and experience, Detective Wells found Defendant's behavior was consistent with hand-to-hand drug transactions.

While conducting surveillance on January 10, 2023, detectives observed Defendant leave his apartment building, walk to 6th Street, and enter a sedan for approximately five minutes before

exiting. Once he exited the sedan, he acknowledged a different vehicle, a Honda, with a hand gesture, walked back to his apartment building, and entered his apartment building. The Honda followed and pulled into the apartment building's parking lot.[10] Defendant stayed in the apartment building for approximately five minutes before exiting and motioning the Honda back towards 6th Street. Once on 6th Street, he entered an Audi for about thirty seconds before exiting and then entered the Honda for no more than one minute. The Honda drove eastbound, law enforcement followed and conducted a traffic stop. Officers found the driver of the Honda in possession of a user amount of fentanyl, which is the same drug Defendant was reportedly selling from his apartment.

Based on Defendant's presence in his apartment immediately before, after, and in between the suspected hand-to-hand drug transactions, it is a reasonable to infer drugs would likely be in Defendant's apartment. *See Juneau*, 73 F.4th at 616 (finding probable cause to search an individual's residence based, in part, on investigators witnessing what they believed to be a drug transaction conducted by the individual immediately after he left his residence) (citation omitted); *see also United States v. Patterson*, 666 F. App'x 569, 570-72 (8th Cir. 2016) (observing surveillance of drug dealer's repeated visits to a house in between suspicious meetings established a nexus to search the home for contraband).

In addition, the Search Warrant Application indicated officers found fentanyl – the controlled substance reportedly sold by Defendant – on the Honda's driver who had interacted with Defendant moments before officers stopped him. *See United States v. McGee*, No. 22-03124-01-CR-S-BP, 2023 WL 8434031 at *4 (W.D. Mo. Dec. 5, 2023) (upholding a probable cause finding where, among other things, a "suspected buyer was stopped and, while she did not state she bought drugs from [the defendant], she had drugs similar to those [the defendant] was alleged to sell."). Further, the Search

---

[10] Detective Wells testified the driver of the Honda threw open the vehicle's door and started vomiting. Doc. 75 at 15. The detective explained, based on his experience, people addicted to fentanyl tend to get dope sick when they go without the drug for a period of time. *Id*. None of this information was included in the Search Warrant Application. *See* Ex. 1.

Warrant Application represented Defendant was out on bond for a Jackson County case involving possession of controlled substances, including 143 pills of alprazolam. *See United States v. Turner*, 953 F.3d 1017, 1020 (8th Cir. 2020) (finding a defendant's criminal history contributed to a finding of probable cause); *see also Juneau*, 73 F.4th at 616. Affording substantial deference to Judge Rodecap's probable cause determination, the undersigned finds it was reasonable for her to draw an inference, based on the totality of circumstances, that evidence related to drug distribution would be located inside Defendant's apartment. *See Brackett*, 846 F.3d at 922.

Defendant avers "[t]he drugs could have been concealed in the laundry area or the other apartment." Doc. 54 at 8. However, the undersigned finds the totality of circumstances in this matter support a reasonable inference that Defendant was storing contraband in his apartment. *See Brackett*, 846 F.3d at 992; *see also United States v. Mayweather*, 993 F.3d 1035, 1041 (holding the good-faith exception applies even when there is no direct nexus between a defendant's continuous course of drug dealing and his residence because an officer and issuing judge may "logically infer that a drug dealer would store contraband at his residence."). The undersigned recommends the Court find the same.

### 3. Specificity of Search Warrant Application

Defendant also claims the Search Warrant Application lacks specificity because Detective Wells did not explain how he concluded Defendant's observed activity was consistent with hand-to-hand drug transactions, nor how he determined the alleged transactions involved fentanyl. Doc. 54 at 6. The Supreme Court has recognized search warrant "[a]ffidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *Gates*, 462 U.S. at 235 (internal quotations and citation omitted). Therefore, "[t]echnical requirements of elaborate specificity . . . have no proper place in this area." *Id*. A search warrant affidavit "should not be assessed paragraph by paragraph; it must be evaluated as a whole." *United States v. Luloff*, 15 F.3d 763, 767 (8th Cir. 1994) (internal quotations and citation omitted). An issuing judge must review a search warrant

affidavit with a "common sense approach and not in a hypertechnical fashion." *United States v. O'Dell*, 766 F.3d 870, 873-74 (8th Cir. 2014) (citation omitted).

In the Search Warrant Application, Detective Wells indicated a report was made about Defendant selling fentanyl from his apartment. Then, detectives corroborated the report by conducting surveillance, during which they observed Defendant frequently exit and enter his apartment building to engage in short meetings with people in multiple different vehicles. In addition, immediately after Defendant interacted with the Honda's driver, officers stopped the driver and learned he possessed fentanyl. *See supra*, sections II(A), III(A)(1)-(2). Based on his experience, Detective Wells believed Defendant was engaging in hand-to-hand drug transactions. Further, the Search Warrant Application represented Defendant was out on bond for a Jackson County case involving possession of controlled substances.

In evaluating the application as a whole with a common-sense approach and affording the issuing judge substantial deference, the undersigned finds the Search Warrant Application provided a sufficient basis for Judge Rodecap's probable cause finding. *See Luloff*, 15 F.3d at 767; *O'Dell*, 766 F.3d at 873-74. Accordingly, the undersigned recommends the Court find the same.

**B.      Good-Faith Exception**

The Government asserts that even if there was not sufficient probable cause in the Search Warrant Application, the good-faith exception applies. Doc. 55 at 5-6; Doc. 66 at 28. Defendant argues the good-faith exception does not apply. Doc. 54 at 8-9; Doc. 66 at 10, 29-30. When evidence is seized in violation of the Fourth Amendment, it may be suppressed under the exclusionary rule. *United States v. Eggerson*, 999 F.3d 1121, 1124 (8th Cir. 2021) (citing *Leon*, 468 U.S. at 906). However, suppression of evidence "has always been . . . [the] last resort, not [the] first impulse. *Utah v. Strieff*, 579 U.S. 232, 237-38 (2016) (citation omitted). When a search warrant is defective or

invalid, the good-faith exception to the exclusionary rule may still apply. *Eggerson*, 999 F.3d at 1124 (citing *Leon*, 468 U.S. at 925).

The good-faith exception establishes "that if an officer obtains a search warrant . . . that appears properly issued on its face" and "executes it within its scope and with objective good faith reliance on the warrant's validity, then a defect in the probable cause analysis undergirding that warrant will not cause evidence to be suppressed." *Id*. (citing *Leon*, 468 U.S. at 922). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (citation omitted).

"In assessing whether an officer relied in good faith on the validity of a warrant, a reviewing court considers the totality of the circumstances, including any information known to the officer but not included in the affidavit." *United States v. Ralston*, 88 F.4th 776, 779 (8th Cir. 2023) (citation omitted). An officer's reliance on a search warrant is objectively unreasonable in four instances: (1) the affidavit or testimony supporting the warrant contains a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) the issuing judge wholly abandons her judicial role in issuing the warrant; (3) the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid. *Id*. Defendant avers the good faith exception does not apply in this matter because the search warrant application was so lacking in indicia of probable cause as to render

official belief in its existence entirely unreasonable, and the warrant was so facially deficient that no police officer could reasonably presume the warrant to be valid.  Doc. 66 at 11, 24.[11]

1.    **Whether the Search Warrant Application was so Lacking in Indicia of Probable Cause as to Render Official Belief in its Existence Entirely Unreasonable**

The Eighth Circuit has explained "'entirely unreasonable' is not a phrase often used by the Supreme Court, and [the Eighth Circuit] find[s] nothing in *Leon* or in the [Supreme] Court's subsequent opinions that would justify . . . dilution of the [Supreme] Court's particularly strong choice of words." *United States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003).  The Eighth Circuit has applied the good-faith exception in controlled-substance cases even when an affidavit did not establish a nexus between the search location and the suspected contraband.  For example, in *United States v. Mayweather*, the Eighth Circuit found "[t]he issuing judge could reasonably infer that evidence of cocaine distribution would be at [the defendant's] residence," and therefore, law enforcement's reliance on the search warrant was objectively reasonably, and the good-faith exception applied.  993 F.3d 1035, 1041(8th Cir. 2021); *see also United States v. Moya*, 690 F.3d 944, 948-49 (8th Cir. 2012).

Here, the Search Warrant Application stated Defendant was released on bond in a case involving possession of controlled substances; he was reportedly selling fentanyl from his apartment; and he was observed on multiple occasions leaving his apartment building, walking through an alleyway to 6th Street, entering different vehicles for very short periods of time, and then returning to his apartment building.  On January 10, 2023, officers stopped the Honda's driver after he

---

[11] Defendant's oral argument focused on the third and fourth instances of when an officer's reliance on a warrant is objectively unreasonable.  The undersigned does the same.  However, the undersigned also notes no evidence was presented during the evidentiary hearing to suggest the Search Warrant Application contained a false statement or Judge Rodecap wholly abandoned her judicial role in issuing the warrant.  *See* Doc. 75.  To the contrary, Detective Wells testified he made no false statements in the application, and he did not include any statement to knowingly and intentionally, or with reckless disregard for the truth, mislead the reviewing judge.  *See supra*, section II(C) (citing Doc. 75 at 19).  Further, Detective Wells stated there was no indication of Judge Rodecap wholly abandoning her judicial role in reviewing or issuing the search warrant.  *See id*.

interacted with Defendant and found him in possession of fentanyl, the same drug Defendant was reportedly selling from his apartment. Based on their knowledge and experience, law enforcement believed the observed activity was consistent with hand-to-hand drug transactions. Based on the totality of these circumstances, the undersigned finds it was not entirely unreasonable for Judge Rodecap to infer evidence would be located inside Defendant's apartment.

Further, it was objectively reasonable for the officers to rely on the probable cause opinion made by an assistant prosecuting attorney who reviewed the warrant and the probable cause determination made by the judge who issued the warrant. *See United States v. Perry*, 531 F.3d 662, 666 n.6 (8th Cir. 2008). Thus, the undersigned finds the officers' reliance on the search warrant's validity was objectively reasonable. The undersigned recommends the Court find the same.

### 2. Whether the Warrant was so Facially Deficient that No Police Officer Could Reasonably Presume it to be Valid

To determine whether a warrant is so facially deficient that no police officer could reasonably presume it to be valid, the Court considers "alleged infirmities with the warrant itself rather than the affidavit behind the warrant." *See Carpenter*, 341 F.3d at 673. For example, where a warrant "fails to particularize the place to be searched or the things to be seized . . . executing officers cannot reasonably presume it to be valid." *Id*. (citation omitted).

In this matter, the warrant does not fail to particularize the place to be searched or things to be seized. The warrant specifies the address and details how to locate Defendant's apartment inside the building. *See* Ex. 1 at 3. Further, the warrant particularizes the items to be seized – i.e., "fentanyl, a schedule II controlled substance; drug paraphernalia and packaging; proof of occupancy; and U.S. currency close in proximity to illegal narcotics fentanyl, a schedule II controlled substance; drug paraphernalia and packaging; proof of occupancy; and U.S. currency close in proximity to illegal narcotics." *Id*.

In addition, Detective Wells testified nothing about the warrant appeared to be facially deficient. Doc. 75 at 20. He indicated more than ten officers helped execute the search warrant, and none of those officers raised any issue with the search warrant. *Id*. at 21-22. Accordingly, the undersigned recommends the Court find the warrant was not so facially deficient that officers could not reasonably presume its validity.[12]

## C. Fruit of the Poisonous Tree

Defendant contends incriminating evidence found in his residence, and all statements he made related to the search,[13] should be suppressed as fruit of an unlawful search. Doc. 54 at 9-10. Because the undersigned recommends the Court find there was sufficient probable cause in the Search Warrant Application, and alternatively that the good-faith exception applies, the evidence seized from Defendant's apartment and any related statements by Defendant need not be suppressed under the exclusionary rule. *See United States v. Betts*, 88 F.4th 769, 773 (8th Cir. 2023) (citation omitted) (holding the exclusionary rule "extends to evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"); *Eggerson*, 999 F.3d at 1124 (citation omitted).

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress (Doc. 54). Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation.

---

[12] To the extent Defendant claims the warrant is facially deficient because it is not supported by probable cause, the undersigned recommends the Court find sufficient indicia of probable cause existed in the Search Warrant Application to support Judge Rodecap's issuance of the warrant and the officers' reliance on the warrant. *See supra*, section III(A).

[13] Defendant fails to provide argument or authority about the admissibility of potentially incriminating statements. And the Court cannot discern from Defendant's motion what statements he seeks to suppress. Regardless, the Court addresses Defendant's fruit of the poisonous tree argument as it relates to all evidence adduced from the search of his residence.

A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings

in this Report and Recommendation except on the grounds of plain error or manifest injustice.

       **IT IS SO ORDERED.**

DATE: May 23, 2025                      */s/ W. Brian Gaddy*
                                       W. BRIAN GADDY
                                       UNITED STATES MAGISTRATE JUDGE